## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL

| | | |
|---|---|---|
| **MIGUEL CARRERA, JR. and** | § | |
| **JASMINE NOL, Individually** | § | |
| **and As Next Friend of** | § | |
| **A.C., a minor** | § | |
| **Plaintiff,** | § | **CAUSE NO. 2:19-CV-36** |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, UNIVERSITY OF TEXAS** | § | |
| **MEDICAL BRANCH AT GALVESTON,** | § | |
| **ROBERT STEVENS, Individual Capacity,** | § | |
| **GUARD 1, Individual Capacity,** | § | |
| **GUARD 2, Individual Capacity** | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Miguel Carrera, Jr., Individually and as Next Friend of A.C., a minor and Jasmine Nol, Individually and as Next Friend of A.C., a minor brings this their suit against Texas Department of Criminal Justice ("TDCJ"), University of Texas Medical Branch at Galveston ("UTMB"), Robert Stevens ("Warden Stevens"), in his individual capacity for official actions as the former warden of Texas Department of Criminal Justice's Skyview Unit, Guard 1 ("Guard 1"), in his individual capacity, and Guard 2 ("Guard 2"), in his individual capacity.

## Nature of Case

1.    Miguel Carrera, Jr., 22, has suffered schizophrenia since he was a teen.  On or about February 12, 2017, while incarcerated at Texas Department of Criminal Justice's Skyview Unit, Mr. Carrera was left unmonitored with a spoon in his cell while in a severe psychotic episode.  Mr. Carrera removed his right eye with a spoon and severally damaged his left eye in an attempt to remove it as well.  Mr. Carrera is permanently blind.

2.      Mr. Carrera brings suits against the warden and two guards in their individual capacity for their official conduct under color of law for subjecting him, a mentally disabled person, to cruel and unusual punishment as prohibited by the Eighth Amendment and Fourteenth Amendment to the United States Constitution.  In addition, Mr. Carrera brings suit against TDCJ, UTMB, Warden Stevens, Guard 1 and Guard 2 for the violation of Title II of the Americans with Disabilities Act and Rehabilitation Act for subjecting him to cruel and unusual punishment as prohibited by the Eighth and Fourteenth Amendments.

## Juridiction and Venue

3.      This Court has jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331.  The Court has personal jurisdiction over the individual defendants because they were residents of Texas at the time of the events made the basis of the suit.  The Court has personal jurisdiction over the state defendants because sovereign immunity is abrogated in this suit.  Venue of this suit is proper in the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred at Skyview Unit in Rusk, Cherokee County, Texas.

## Parties

4.      Plaintiff, Miguel Carrera, Jr., is a resident of Harris County, Texas.  He is the spouse of Jasmine Nol.  He is the father of A.C.

5.      Plaintiff, Jasmine Nol, is a resident of Harris County, Texas.  She is the spouse of Miguel Carrera, Jr.  She is the mother of A.C.

6.      Defendant, Texas Department of Criminal Justice, is a department of the State of Texas.  It may be served with summons through its executive director: Bryan Collier, 209 West 14th Street, 5th Floor, Price Daniel Building, Austin, Texas, 78701.

7.      University of Texas Medical Branch is a political subdivision of the state.  It may be served with summons through the executive director: David L. Callender, M.D., M.B.A., FACS, 301 University Blvd., Suite 6.100 Administration Building, Galveston, Texas, 77555-0129.

8.      Defendant, Robert Stevens, is a resident of Brownwood, Brown County, Texas.  He was the warden of Skyview Unit during the events made the basis of the suit.  He may be served with summons at: 4201Austin Avenue, Brownwood, Texas 76801.

9.      Defendant, Guard 1, was a resident of Texas at the time of the incident.  There is insufficient information for service of summons.

10.     Defendant, Guard 2, was a resident of Texas at the time of the incident.  There is insufficient information for service of summons.

## Exhaustion of Administrative Remedies

11.     On June 30, 2017, Mr. Carrera submitted a written grievance to Warden Stevens.

## Notice

12.     On June 30, 2017, Mr. Carrera notified the Texas Office of Attorney General and Warden Stevens in writing of the facts of the claim and intent to bring a claim for compensation. On January 31, 2019, Mr. Carrera provided written notice of his claim and a signed authorization form for release of protected health information to UTMB.

## Facts

13.     Miguel Carrera, Jr., 22, has suffered from schizophrenia since he was a teen. Schizophrenia is a chronic and severe mental disorder that interferes with a person's ability to think clearly, manage emotions, make decisions, and relate to others.  A person with schizophrenia experiences hallucinations and paranoid delusions which are very real to the person experiencing them.

14.     In 2014, Mr. Carrera's mental illness caused him to attack a security guard resulting in probation.  Mr. Carrera's mental illness makes him prone to violence directed towards himself. In one episode documented in his criminal and medical records, Mr. Carrera swallowed a taser that the police shot him with in order to gain control over him.  Mr. Carrera's violent psychotic episodes are documented in his criminal and medical records.

15.     While on probation in December 2016, Mr. Carrera experienced another psychotic break.  He began stabbing and slicing himself with a knife.  His wife called the police.  As a result of his previous failure to meet requirements of his probation, the court revoked the probation and sent him to state prison on January 5, 2017.

16.     On February 3, 2017, the Texas Department of Criminal Justice transferred Mr. Carrera from Gurney Unit to Skyview Unit because he was experiencing obvious signs of schizophrenia.  At some point during his incarceration, Mr. Carrera had attempted to harm himself through strangulation according to what the Skyview Unit guards advised the EMS technicians who were called to the scene on February 12.   This fact was not found to be documented in his Skyview Unit records.

17.     On or about February 3, a healthcare provider ordered screening for HIV, syphilis and tuberculosis as well as immunizations for tetanus and diphtheria.  On February 7 at 1:48 pm the Inpatient RN Assessment form noted that Carrera was "less than cooperative not answering questions and will not say if he will continue to try to harm self or not" and "mumbles, not answering question."  EMS records from February 12 state that Mr. Carrera had been banging his head on February 7.

18.     The next morning on February 8, Carrera was scheduled for an intake physical. That morning at 9:36 am, the lab reported by facsimile that Carrera was negative for tuberculosis.

Ten minutes later Carrera was discharged from seclusion on the basis that, "Offender states he is not going to harm self and would like to go back to house.  Denies A/V hallucinations and taught of harm to self and others.  Calm and cooperative with staff and security."  The form stated, "Release criteria (patient informed):  No longer exhibiting behaviors described above".  The nurse practitioner ordered that his materials should be limited to blanket, johnnie sacks, and legal materials without sharps.  Staff to continue monitoring per D-Pod protocol.  D-Pod is the crisis management wing of Skyview Unit.

19.     The Correctional Managed Health Care Policy Manual for Suicide Prevention defines Crisis Management as:

> A status ordered by a QMHP for an offender who is determined to be at imminent risk of significant self-injury or suicide. The offender is to be placed in a specially prepared and approved cell. Offenders in Crisis Management are observed for psychiatric symptoms at least every fifteen minutes by medical/MH staff or a CO with special training at the Inpatient Psychiatric Facility.

20.     At 11:57 am, the nurse practitioner prescribed a 2 milligram risperidone tablet, a medication to treat schizophrenia, twice daily for Carrera.

21.     The Health Summary for Classification dated February 8, 2017 at 1:03 pm stated that there were no restrictions for the facility, housing, row, and bunk assignments.  There were no restrictions for disciplinary process nor an individualized treatment plan.  Although there was a space to indicate a work assignment restriction based for psychiatric reasons, it was not checked.

22.     On the same day that Carrera was allegedly cooperative, non-symptomatic and stated he would not harm himself; Carrera was refusing to consent to mental health services and to take the prescribed risperidone.  He refused to sign 3 forms presented to him regarding his refusal to receive mental health services and psychiatric medication.  This continued to be the case on February 9 and 10.  There are no medical records for February 11, a Saturday.

23.    On or about February 12, 2017, after suffering uncontrollable fear from the hallucination and desiring to end the horrible experience, Mr. Carrera removed his left eyeball completely from the eye socket with a spoon.  This included severing all of the muscles, blood vessels, nerves, ligaments and connective tissue connecting the eyeball to the eye socket.  The eyeball fell to the floor according to Mr. Carrera's recollection.  In reality it was hanging down his face barely attached by the optic nerve.  After, Mr. Carrera performed a self-enucleation of the left eye, he started the same procedure on his right eye.  Mr. Carrera was unable to completely remove his second eyeball, but he caused sufficient damage in the process to cause permanent blindness in his right eye.  Specifically, he tore off the cataract and retina and ruptured the globe.  When a guard finally passed by Mr. Carrera's cell, he witnessed Mr. Carrera crawling around on the floor searching for his left eyeball according to Mr. Carrera's recollection.

8:40 a.m. February 12, 2017

24.    A report made by a healthcare provider after the event states that a guard discovered Mr. Carrera lying in bed with a bloody face.  The report notes that Mr. Carrera was possessing a plastic spoon with blood on it.  The guard claims he had checked for "responsiveness" only from Mr. Carrera around 6:30 am and did not notice that there was a problem.  According to the author of the report, the healthcare providers were notified at 8:40 a.m.  The report stated that Mr. Carrera had 0% compliance with his medication as of that date.  A lab reports shows a glucose fingerstick was performed at 8:45 a.m.  A glucose test is used to check for brain injury during treatment of a trauma.

25.    Skyview Unit called EMS to transport Mr. Carrera to a hospital.

8:52 a.m. February 12, 2017

26.     According to statements made by the Skyview Unit employees to the EMS technicians who provided emergency medical services to Mr. Carrera at the prison at 8:52 a.m., the employee stated that Mr. Carrera suffered from schizophrenia.  It was stated that he was prescribed 2 mg of Risperdal, a mediation to treat schizophrenia.  The medics noted that the left globe was hanging out of the socket, the right had swelling and apparent trauma and a hematoma to the right posterior of skull.   In addition, the medics noted bleeding from the left eye.   The medics' narrative stated, in pertinent part:

> …Patient AOx1 out of 4 (oriented to person only; not place, time, or event; baseline for patient per prison staff).  Skyview Prison infirmary staff stated that the patient had used a spoon to remove his left eye, and the patient stated that he had also tried to remove his right eye with the spoon.  Patient  stated internal "voices" told him to remove his eyes with a spoon.  Skyview prison staff stated that they found the spoon with blood on it in the patient's cell.  The time of the injury is unknown – patient first stated that he did it this morning, then stated that he did it 2 days ago, then stated last night.  Patient had been responsive 6:30 a.m. when the correctional officers check on the patient, but they said that his eyes had not been checked at 6:30 a.m. (it was only checked that he was alert).  There was a belief by prison staff that the injury was likely to have occurred this morning after 6:30 a.m. and closer to 8:30 a.m. when he was found with the eye injury by Skyview Prison correctional officers.  The patient was also reported to have been possibly banging his head against a wall last night or this morning.  The patient has a history of head banging (another recent head banging episode documented from February 7 on patient's prison paperwork).  Patient denied any pain.  Patient stated that he is completely unable to see out of either eye…. Provided Abbreviated Hospital Report and verbal report to RN and MD and patient was transferred ["to ETMC-Tyler, closest appropriate level one trauma facility"]… 2/12/2017 09:51 Facility Acceptance Employee – W. RN, Cassi

The Abbreviated Hospital Report provided by the first responders stated, "Meds: Risperdal only, but pt refused to take."

9:55 a.m. on February 12, 2017

27.     The initial nurse assessment entered by Cassi L. Wilbur, R.N. stated:

Pt- T2 via stretcher from EMS ad in custody of Skyview after attempting "to remove both his eyeballs with a plastic spoon" per report.  Per EMS (and confirmed by guards), pt has extensive psychiatric history with previous diagnosis of schizophrenia with self-harming behaviors/self-mutilation.  Pt received in TDCJ shackles/chains in NAD.  Gauze removed from eye by MD Kauffman for assessment.  R eye swollen shut with scant SS drainage

from outer canthus.  L eye globe protruding from socket; eye globe dry on arrival; rinsed with NS per orders; pupil nonreactive, without sensation per pt.  Pt also has palpable hematoma to R side of skull 'where was banging it' per pt.  Laceration & abrasions at wrist sites mostly healed with dry, flaky skin.  No other visible or palpable injuries.  Pt is fully oriented,  Speech is clear.  Pt reports voices telling him to hurt himself;  "they told me to get my eyes out of my head."  Pt reports voices never subsides.  Pt denied that voices are telling him to harm himself or others at this time.  Pulse is regular.  Resps even and unlabored. Lungs CTA.  No crepitus. Abdomen soft, non-tender. Pelvis is stable. (+) BS x4.  Skin warm and dry.  Mucous membranes pink and moist.  POC and safety reviewed. Pt nodded to indicate understanding; will reinforce as necessary.  Guards remain ABS for patient safety.

The Assessment report ordered 1:1 observation. The Assessment notes that he has self-harming behaviors and thoughts of self-harm.

28.     The Emergency Room doctor's notes states, in part: "Pt. a resident @ Skyview – criminal psych.  H/O schizophrenia, non compliance and self injury.  States he was hearing voices telling him to hurt himself, was able to conceal a spoon which he used to remove his L eyeball and attempted the same on his R eyeball although was not able to completely remove it.  Spoon was found in room w/pt. per…b/w 0630-0830 min today…enucleation of L eye globe and ruptured globe R."

10:43 am on February 12, 2017

29.     The preliminary CT scan of the head noted: (1) subcutaneous emphysema in the soft tissues of the face and neck; (2) intracalvarial soft tissue swelling posteriorly on the right and more severe toward the vertex where it measured 2.8 cm; and (3) absence of the right globe and left globe contains hyper density and is propotic.

11:13 a.m. on February 12, 2017

30.     Dr. Adam Dossey, an ophthalmologist, consultation notes provide, in part:

CHIEF COMPLAINT: Self-directed injury to both eyes.  HISTORY OF PRESENTING ILLNESS:  The patient is a 21-year-old Hispanic male who was admitted to the mental health inpatient psychosocial facility in Rusk approximately seven days ago.  This patient has a history of schizophrenia as well as bipolar disorder.  Per the report, about five days

ago the patient had a suicidal attempt with strangulation attempt.  The patient was found today after self-mutilation of both globes.  The left globe was found to be exterior to his upper and lower eyelids.  The right globe had severe mutilation and exposed sclera at the palpebral fissure but the globe was inside the orbit.  This was presumed to be done by possibly a spoon, per the report.  The patient was taken from the unit into ETMC and is here for further evaluation.

1:16 pm on February 12, 2017

31.     Dr. Helen Markowski, a trauma and critical care surgeon, stated in her evaluation,

in part:

> CHIEF COMPLAINT: Self-harm.  HISTORY AND PHYSICAL:  This is a 21-year-old male with a complicated past psych history,  He presented to the ER.  He is incarcerated at Skyview, apparently was in restraints for trying to choke himself and they could keep him in restraints for four hours and after this they were allowed to go to their cell.  In his cell, he has a peanut butter and jelly sandwich usually and a spoon for whatever other food that they present to him and used the spoon to remove his eyes and was subsequently brought to ETMC.  On imaging of his head, neck, chest, abdomen and pelvis, obvious bilateral globe rupture.  Ophthalmology was called and plans bilateral enucleation.  There is also a significant amount of subcutaneous emphysema air tracking along the planes that makes concerning for a tracheal injury.  I see no potential etiology for this.  It is possible that it came from his enucleation with his spoon's connection to the maxillary sinus, but on the imaging of the CT head and neck….PAST MEDICAL HISTORY: Reportedly from his facility, he is not actually forthright with his diagnosis, but treated for PTSD in 2016, says he fell while he was skating.  Seizure in 2015.  PTSD 2016.  There is some reports in the last couple of year where he has been hearing voices and in fact he heard voices for his episode today.  He has also been admitted a couple of times for self-harm where he stabbed himself.  He has a past medical history for polysubstance abuse as well.  SOCIAL HISTORY:  He has polysubstance abuse and he also says his mom is bipolar and schizoaffective and thinks that he may be schizophrenic as well.  He did come with a DSM-IV diagnostic impression of unspecified schizophrenia from his institution.

Surgery on Eyes on February 12, 2017

32.     The surgery took five hours.  The surgeon noted that there was evidence of the blunt

trauma to the side of Mr. Carrera's head.  Dr. Dossey noted it was a very difficult surgery.  During

the middle of the surgery he requested additional help from another surgeon at the hospital.  Dr.

Dossey stated in his operative note, "Again, the disorganized nature of the right globe cannot be

overstated.  There was uvea intermixed with scleral contents.  There was no cornea to be found.

There was an effort to undermine some of the conjunctiva to see if we could identify pieces and piece them back together as best possible.  Again, chances of vision in the right eye are completely zero, and the patient will have to be enucleated at a later time."   Dr. Dossey also noted that the conjunctiva of the left globe was extensively torn and the lateral rectus muscle was completely dehisced.  There was a laceration completely across the globe.  The left globe was removed.

33.     On February 15, 2017, Jeffrey L. Pledger, RN notes patient asked, "Is there any way to save myself."  The nurse noted that Mr. Carrera requested twice more for help to save himself.

34.     Mr. Carrera was discharged from ETMC on February 16, 2017 to the infirmary at Skyview Unit.  He was re-admitted to UTMB-Galveston on February 23, 2017 for an eye implant for the right eye and assessment of left eye.  He was noted to be on 6 milligrams Risperdal.  This is contrast to the mere 4mg dose of Risperdal while at Skyview Unit which he was not taking because Skyview United did not apply enforced mediation for Mr. Carrera.  The psychiatric evaluation at UTMB-Galveston noted that Mr. Carrera stated that he wanted to make the voices stop and he wanted to get better.

35.     The Suicide Prevention Plan in the Texas Correctional Managed Health Care Policy Manual effective from August 23, 2016 to August 16, 2017 provides, in part:

PURPOSE:  To provide policy, defined procedures, and a program for identifying and responding to suicidal individuals.  Prevention of suicide is the responsibility of Health Services staff as security and other correctional personnel.

POLICY:  A program exists to provide specialized programming, intervention, training and tracking for the prevention of offender suicide.

I. DEFINITIONS:

1. Mental Health Observation (MH obs):  A status ordered by a Qualified Mental Health professional (QMHP) for an offender who is determined to be at risk of self-injury but is not actually suicidal or an imminent risk to do significant medical harm.  The offender is

to be placed in a specially prepared and approved cell.  Offender in MH Obs are observed for psychiatric symptoms at least every thirty minutes by medical/MH staff.

2. Crisis Management:  A status ordered by a QMHP for an offender who is determined to be at imminent risk of significant self-injury or suicide.  The offender is to be placed in a specially prepared and approved cell.  Offenders in Crisis Management are observed for psychiatric symptoms at least every fifteen minutes by medical/MH staff or a CO with special training at the Inpatient Psychiatric Facility.

3.  Constant and Direct Observation (CDO):  A status in which an offender who is determined to require movement to Crisis Management is pending transport.  IN CDO the offender is constantly observed by an officer who is close enough and has the means to intervene to prevent self-injury.  Note: this status is not ordered by providers but is a function that security provides upon providers issuing an order for Crisis Management until the offender can be delivered to Crisis Management.

III. Identification, Intervention and Referral.

B.  Offenders who are identified as "at risk" for suicide or self-injury will be evaluated immediately by a mental health or medical clinician.  ….Suicidal offenders will be moved immediately to an environment in which offender safety is ensured, and constant and direct observation (CDO) can be maintained.

D.  An offender is appropriate for outpatient Mental Health Observation is:
1. She/he has made no act of self-injury requiring ongoing medical attention.

2.  Behavior and/or mental status do not necessitate the use of physical restraint.

3.  Behavior and/or mental status do not necessitate enforced medication.

4.  The offender/patient is not acutely psychotic, acutely suicidal, severely depressed or otherwise seriously mentally ill.

These offenders who do not meet the above criteria are inappropriate for Mental Health Observation and should be transferred immediately to a crisis management or inpatient facility. Offenders awaiting transfer to a crisis management facility must be held in a safe environment under constant and direct observation (CDO) until departure from the facility.

IV.  Constant and Direct Observation (CDO).

A. Security officers will provide constant and direct observation according to Security Procedures.

C. A QMHP when available, will assess all offenders in CDO at least once per day. Nursing will make rounds once per day.

VI.  Housing Criteria for Mental Health Observation/Crisis Management.

A.  Any room or cell used for Mental Health Observation / Crisis Management must have the following:

1. Adequate lighting.

2.  No exposed electrical outlets.

3. Ability for the observer to see the entire room without entering.

4.  No fixtures which the offender may use to harm him/herself.

5.  Adequate ventilation during warm weather and adequate heat during the cold weather.

C.  Prior to use, all cells or rooms intended for use as Mental health Observation/Crisis Management areas must be visually inspected and approved by the Facility Warden, Supervising qualified mental health professional, Facility medical Director and Director if Nurses.

VII.  Care and documentation for offenders while in Mental Health Observation or Crisis Management.

A.  Clothing, mattress, blanket, eating utensils and legal material are allowed unless otherwise ordered by a QMHP.  Offenders who are at risk for self-injury should not be permitted to possess items with which they may injure themselves.  Offenders may be provided with agency approved "suicide" blankets in lieu of regular linen.  Paper gowns must be provided if all clothing is removed.  If the QMHP considers the paper gown to be contraindicated or dangerous to the patient, the offender will be placed on one to one observation.

B.  Offenders may not be denied possession of legal materials except under the following circumstances:

1.  Items with which the offender may harm him/herself, such as pencils, pens, paper clips and staples may be denied with written justification in the health record.

C.  Offenders in Mental health Observation must be visually checked a minimum of once every 30 minutes by mental health, medical staff or by security staff.  Offenders in Crisis Management must be visually checked a minimum of once every 15 minutes by mental health staff, medical staff, or by a CO with special training at the Inpatient Psychiatric Facility.

D.  A QMHP will be notified if the offender's mental status significantly deteriorates.

36.     Warden Stevens and the guards failed to directly and constantly monitor Mr. Carrera to prevent Mr. Carrera from removing and damaging his eyes.  Further, Warden Stevens and the guards failed to make certain that Mr. Carrera did not have access to a spoon which could be used as a weapon of self-harm.  These failures subjected Mr. Carrera to cruel and unusual punishment.

37.     TDCJ and UTMB intentionally failed to protect Mr. Carrera, a disabled person, from cruel and unusual punishment.  Mr. Carrera suffers from schizophrenia and psychosis which is a mental impairment that substantially limits numerous life activities.  Mr. Carrera had a record of this impairment before prison and in prison including a suicide attempt five days earlier by strangulation while in custody of Skyview Unit.  He also inflicted self-harm in the form of head banging for hours before the self-enucleation.  He was clearly impaired because he was in a state of acute psychosis with suicidal ideation due to the mental illness of schizophrenia.   TDCJ and UTMB deliberately under-staffed Skyview Unit in order to achieve unrealistic budget goals.  This resulted in employees who were overworked and overtaxed in high anxiety and pressured filled jobs.  TDCJ and UTMB intentionally failed and refused to provide constant and direct or even quarter hour monitoring for mentally ill inmates in need of monitoring.

38.     UTMB and TDCJ, through its employees, intentionally discriminated against Mr. Carrera on the basis of his disability when they refused to implement the suicide prevention policy.  Specifically, the employees of UTMB and TDCJ purposely withheld constant and direct monitoring or even every 15 or 30-minute monitoring of Mr. Carrera.  The decision to not monitor Mr. Carrera but every few hours was deliberate because there was insufficient staff to conduct the monitoring.

39.     In addition, UTMB willfully under medicated Mr. Carrera in order to save on medical cost.  In 2017, a year in which the legislature was in session, the state government was under pressure to cut the budget for medical care for inmates.  The pressure was self-imposed because of Texas' refusal to accept the Obamacare Medicaid expansion which would provide federal funds for prisoner's medical care.  In light of the tight budget, UTMB and TDCJ prescribed only 4mg of Risperdal for Mr. Carrera rather than an appropriate dose of 6 milligrams.  Further, UTMB and TCDJ intentionally refused to force medicate Mr. Carrera.  This resulted in saving money on medication.  However, it left Mr. Carrera in a state of extreme self-harm psychosis as evidenced by the suicide attempts and self-harming behavior.

40.     Further, UTMB and TDCJ intentionally provided Mr. Carrera with a utensil which should have been withheld under the suicide prevention policy and common sense.

41.     The UTMB and TDCJ employees knew that Mr. Carrera was mentally ill and desired to harm himself.  They knew he was unable to control himself because of his mental illness disability.  UTMB and TDCJ's employees' actions amounted to intentional discrimination against Mr. Carrera due to his disability in that they purposefully, intentionally, and deliberately withheld basic mental health services provided for mentally ill prisoners while in the custody of the state. The employees were aware that by refusing to monitor Mr. Carrera, under medicating Mr. Carrera, and providing a utensil that could be used for self-harm to Mr. Carrera, all rendering him in a helpless state of psychotic desire to kill himself, that they were treating him differently than non-mentally ill patients.

## Violation of 42 U.S.C. 1983

42.     The failure to constantly and directly monitor Mr. Carrera and permitting him access to a spoon resulted in a violation of Mr. Carrera's right to not be subjected to cruel and

usual punishment as guaranteed by the Eighth Amendment of the United States Constitution.  Mr. Carrera has a private right of action against the individual defendants for fair and just compensation for the deprivation of his constitutional right.  "Every person, who under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…".  42 U.S.C. § 1983.  Mr. Carrera seeks recovery from Warden Stevens, Guard 1 and Guard 2 for depriving him of his constitutional right to not be subjected to cruel and unusual punishment.

43.     The right to not be subjected to cruel and unusual punishment was a clearly established right at the time Mr. Carrera blinded himself while experiencing hallucinations and paranoid delusions in the custody of the state.  Warden Stevens, Guard 1 and Guard 2 deprived Mr. Carrera of the right to not be subjected to cruel and unusual punishment when they failed to directly and constantly monitor him and permitted him access to a spoon.  There is no dispute that Mr. Carrera had access to a banned object.   Further, the facts establish that the individual defendants were not monitoring Mr. Carrera because the removal of an eyeball, i.e., detaching it from all of the muscles, nerves, blood vessels, ligaments and connective tissues, with a spoon is an undertaking that requires time.

44.     The individual defendants had actual knowledge that Mr. Carrera wanted to inflict serious self-harm or suicide, yet they proceeded with deliberate indifference in ignoring his threats of self-harm, refusing to stop him from hitting his head in an attempt to harm himself, failing to monitor him, and allowing him access to an object with which he inflicted serious and permanent

injury on himself. The individual defendants had actual knowledge that Mr. Carrera was mentally ill, experiencing hallucinations and paranoid delusions in a psychotic episode, and was unable to prevent harm to himself yet deliberately ignored him. The individual defendants also had actual knowledge that a spoon was an object that mentally ill offenders are not permitted to possess. Yet the individual defendants permitted Mr. Carrera to have access to it. Suicide and self-harm inflicted by a mentally ill offender is cruel and unusual punishment because it is the unnecessary and wanton infliction of pain and permanent impairment.

## Individual Defendants not Entitled to Qualified Immunity

45.     The individual defendants' conduct of ignoring Mr. Carrera and permitting Mr. Carrera access to a utensil during an ongoing psychotic episode taking into account Mr. Carrera's recorded history of self-harm was not objectionably reasonable in light of the clearly established constitutional right to not be subjected to cruel and unusual punishment. The right to not be subjected to cruel and unusual punishment was so clearly established at the time of the incident that a reasonable official would understand that ignoring the threats of self-harm, acts of self-harm, failure to monitor, and allowing the mentally-ill-prisoner-with-a-documented-history-of-self-harm access to a tool of self-harm clearly violated Mr. Carrera's constitutional right to not be subjected to cruel and unusual punishment. The facts demonstrate that the individual defendants' actions were either plainly incompetent or they knowingly violated Mr. Carrera's Eighth Amendment rights. In other words, all reasonable officials under the same circumstances would have known that the above-described conduct violated Mr. Carrera's right to not be subjected to cruel and unusual conduct.

## Violation of Title II of Americans with Disabilities Act and Rehabilitation Act

46.     The Americans with Disabilities Act defines a disability as a physical or mental impairment that substantially limits one or more major life activities, a record of such impairment, or a determination of having an impairment.  Similarly, the Rehabilitation Act of 1973 prohibits discrimination on the basis of the disability in programs receiving federal financial assistance. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12312. TDCJ and UTMB intentionally discriminated against Mr. Carrera through its policy, custom and practice of deliberately under-staffing the prison.  Offenders with schizophrenia who are experiencing psychotic episodes and threatening self-harm require constant monitoring and direct supervision so that immediate action may be taken to prevent self-harm or suicide.  TDCJ and UTMB had an insufficient number of employees to properly monitor for the crisis occurrence or provide constant monitoring during the crisis given the number of offenders at Skyview Unit.  As a result, UTMB and TDCJ made a deliberate decision to only monitor Mr. Carrera every two hours. This decision, along with the decision to under-medicate Mr. Carrera plus allowing him access to a spoon, proximately caused Mr. Carrera to blind himself.  TDCJ and UTMB are vicariously liable for the acts and omissions of its employees and policymakers.  *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567 (5th Cir. 2002).

47.     Further, UTMB and TDCJ purposely prescribed too low of a dose of medication to treat schizophrenia and intentionally did not force Mr. Carrera to take the medication.  Further, UTMB and TDCJ deliberately gave Mr. Carrera a spoon.  The intentional discrimination violated Mr. Carrera's Eighth Amendment right to not be subjected to cruel and unusual punishment which is a right incorporated in Section 1 of the Fourteenth Amendment.

48.     The UTMB and TDCJ employees knew that Mr. Carrera was mentally ill and desired to harm himself.  They knew he was unable to control himself because of his mental illness disability.  UTMB and TDCJ's employees' actions amounted to intentional discrimination against Mr. Carrera due to his disability in that they purposefully, intentionally, and deliberately withheld basic mental health services provided for mentally ill prisoners while in the custody of the state. These actions were carried out for a week before Mr. Carrera blinded himself with the spoon, so they amount to more than an isolated act of negligence by government employees.  The employees were aware that their acts amounted to treating Mr. Carrera differently than non-mentally ill patients.

### UTMB  and TDCJ not Entitled to Sovereign Immunity

49.     UTMB and TDCJ are subdivisions or departments of the state.  However, they are not entitled to sovereign immunity for violation of Title II of the American with Disabilities Act because Mr. Carrera's right to be free from cruel and unusual punishment is protected not only under the Eighth Amendment but also under Part 1 of the Fourteenth Amendment.   *United States v. Georgia,* 546 U.S. 151 (2006).

50.     Further, the acceptance of federal financial aid to pay student tuition amounts to abrogation of sovereign immunity for a state entity.  42 U.S.C. § 42 U.S.C. § 2000d-7.   *Bennett-Nelson v. La. Board of Regents,* 431 F.3d 448 (5th Cir. 2005, cert. denied).  UTMB receives federal funds for the tuition payment of its medical students and federal grants for medical research.

### Damages

51.     The defendants' deprivation of Mr. Carrera's constitutional rights and the defendants' violation of the American with Disabilities Act and Rehabilitation Act directly,

proximately and in fact caused the following damages to which Mr. Carrera is entitled to under the law:

     a.  Physical pain and mental anguish sustained in the past;

     b.  Physical pain and mental anguish that, in reasonable probability, Mr. Carrera will suffer in the future;

     c.  Physical impairment in the past;

     d.  Physical impairment that, in reasonable probability, Mr. Carrera will suffer in the future;

     e.  Loss of earning capacity sustained in the past;

     f.  Loss of earning capacity that, in reasonable probability, Mr. Carrera will suffer in the future;

     g.  Disfigurement sustained in the past;

     h.  Disfigurement that, in reasonable probability, Mr. Carrera will suffer in the future;

     i.  Medical care expenses incurred in the past; and

     j.  Medical care that, in reasonable probability, Mr. Carrera will suffer in the future.

52.    Ms. Nol is entitled, under the private right of action provided by § 1983 and under Texas tort law as a derivate claimant, the following:

     a.  Loss of household services sustained in the past;

     b.  Loss of household services that, in reasonable probability, Ms. Nol will suffer in the future;

     c.  Loss of consortium sustained in the past; and

     d.  Loss of consortium that, in reasonable probability, Ms. Nol will suffer in the future.

53.    The physical injury to Mr. Carrera was a serious, permanent and disabling injury. A.C. is entitled, under the private right of action provided by § 1983, and under Texas tort law as a derivate claimant, the following:

    a.  Loss of consortium services sustained in the past; and

    b.  Loss of consortium that, in reasonable probability, A.C. will suffer in the future.

## **Punitive Damages**

54.    The individual defendants' deprivation of Mr. Carrera's constitutional right to not be subjected to cruel and unusual punishment was committed with reckless and callous disregard for his rights.  The defendants' violation of the ADA was intentionally committed.    Therefore, the plaintiffs seek punitive damages.

## **Prayer**

55.    The plaintiffs pray that the defendants be summoned and answer to this Complaint, and that the plaintiffs have and recover from the defendants the following:

    i.    Actual damages;

    ii.    Statutory damages;

    iii.    Punitive damages;

    iv.    Reasonable cost of the necessary legal services pursuant to 42 U.S.C. § 1988(b) and 42 U.S.C. § 12205;

    v.    Expert fees pursuant to 42 U.S.C. § 1988(c) and 28 U.S.C. § 1920;

    vi.    Costs pursuant to 28 U.S.C. § 1920;

    vii.    Interest pursuant to 28 U.S.C. § 1961; and

    viii.    All other relief to which the plaintiffs are entitled.

Respectfully submitted,

The Greenwood Prather Law Firm, PLLC


By: /s/ Kelly G. Prather
        Kelly Greenwood Prather
        TBN: 00796670;

2009 North Durham Drive
Houston, Texas 77008
Telephone: (713) 333-3200
Facsimile: (713) 621-1449
Kelly@HoustonInjuryLaw.com

**Certificate of Service**

I certify that I served Plaintiffs' First Amended Petition on all attorneys of record as set-forth below through ECF on this the 15th day of July, 2019 in accordance with the Federal Rules of Civil Procedure.

/s/ Kelly G. Prather
Kelly Greenwood Prather

Hon. Ken Paxton
Mr. Jeffrey C. Mateer
Mr. Brantley Starr
Mr. Darren L. McCarty
Ms. Shanna E. Molinare
Ms. Heather Rhea
Mr. Jonathan M. Pena
Office of the Attorney General
PO Box 12548, Capitol Station
Austin, Texas 78711-2548
512-463-2080 telephone
512-936-2109 facsimile
heather.rhea@oag.texas.gov

Mr. Ken Paxton
Mr. Jeffrey C. Mateer
Mr. Brantley Starr
Mr. Darren L. McCarthy
Ms. Shanna E. Molinaire
Ms. Jeanine M. Coggeshall
Office of the Attorney General
PO Box 12548, Capitol Station
Austin, Texas 78711-2548
512-463-2080 telephone
512-370-9811 facsimile
jeanine.coggeshall@oag.texas.gov